[S. F. No. 16205. In Bank.—July 26, 1939.]

GERALD DeGRAF, Respondent, v. THE ANGLO CALIFORNIA NATIONAL BANK OF SAN FRANCISCO (a Corporation) et al., Appellants.

Redman, Alexander & Bacon and Herbert Chamberlin for Appellants.

Glensor & Schofield for Respondent.

Philander B. Beadle and James Martin MacInnis, as *Amici Curiae*, on Behalf of Respondent.

HOUSER, J.—The essential facts upon which the action herein was predicated, in substance, appear to be that at the time here involved plaintiff was the manager of the business of a tenant who occupied offices in a three-story office building which was owned by the defendants; that on November 14, 1936, a parade was to take place at night on the street on which the building faced, and although, ordinarily, the building was kept open during daytime office hours only, the manager of the building "invited" the tenants thereof to view the parade therefrom. Solely for that purpose, plaintiff, who was accompanied by some guests, arrived at the building at "dusk", which was at about 6:30 o'clock P. M. However, he decided that instead of using any portion of the building for the purpose of viewing the parade, he and the members of his party would occupy a portion of the sidewalk in front of the building. The ground floor of the building was divided into two main parts, namely, a front, or "display" room, and a rear, or shipping room. Adjoining the "display" room was a passenger elevator; and opening off the shipping room was a freight elevator, which was customarily used by tenants of the building, not only for the purpose of conveying freight, but also occasionally for the carriage of passengers. During the daytime, the defendants furnished an operator for the passenger elevator, but none for the freight elevator,—the latter service being performed by each tenant for himself. On the night when the parade occurred, the front or "display" room of the building was lighted, as also was a stairway from the first to the third floor, upon the latter of which was located the

office of plaintiff's employer. Other than such light as "filtered" from the front or "display" room, over its transoms, the shipping room was unlighted; nor was the "cage" of the freight elevator otherwise illuminated. In order that he and the several members of his party might be made more comfortable while occupied in viewing the parade from the sidewalk, plaintiff procured from his office some chairs and empty boxes upon which his guests might be seated. In doing so, he used the freight elevator for the purpose of transporting himself, his younger son, and the chairs and boxes. A possible means of illuminating the freight elevator was available through the use of an electric light globe which was inconspicuously placed among the beams which composed the support for the incomplete roof of the said elevator. Three of the sides or walls, built up from a platform to form the enclosure or "cage" of the elevator, were of wooden construction and, on each floor, the entrance to the "cage" was afforded through the use of two wooden glass-paneled doors, which, except by the use of force, ordinarily could not be opened at any designated floor of the building unless at a time when the floor of the elevator "cage" was on a level therewith. Neither could such doors be opened on any specified floor of the building if at the same time the freight elevator was stationed with the entrance doors open at any other floor thereof. Nor could the elevator be operated in a normal manner unless the doors of the elevator shaft at all floors were closed. However, as to the operation of the freight elevator, each of such conditions was subject to control by the application of an electrical contrivance, or emergency release switch, which was made to operate by the use of a push-button, which was located in a (supposedly) glass-covered box within the "cage" of the elevator,—at least such was the substance of a requirement of a safety order that theretofore had been issued by the industrial accident commission, as follows: " 'The emergency release shall be so arranged that to operate the car under emergency conditions it shall be necessary for the operator to break a glass cover protecting the emergency release and to hold the emergency release in operating condition. The emergency release shall be so constructed and installed that it cannot be readily tampered with or plugged into the operating position.' " However, it appears that neither on the night when the said parade occurred, nor at any time within sev-

eral months immediately preceding that occasion, had a glass cover been provided for the box within which was contained the emergency release. By some means, the glass had been broken and, although that fact was known to the defendants, the broken glass had never been replaced by a new one, or otherwise restored. The elevator was operated by the pulling of a rope or cable. By reason of the design of the elevator and the use for which it was intended, it was customary, when it was not in use, to keep it stationed at the first floor of the building, with the entrance doors thereof open. That such condition might be maintained, the defendants kept posted within the "cage" a large sign which read, "Elevator Must Be Returned To First Floor When Empty."

Shortly after the time when plaintiff arrived at the building on the evening hereinbefore indicated, and following his determination to secure chairs and boxes from his office to be used by the members of his party on the sidewalk in front of the building, he went through the front or "display" room,—thence, through the dimly-lighted shipping room to the freight elevator, the doors of which were open. On entering the freight elevator, he struck several matches in an endeavor to locate an electric light globe which he thought was located therein, but was unsuccessful in his search in that regard. Thereupon, he operated the unlighted freight elevator to the third floor of the building, where his office was located, procured the desired chairs and boxes and returned with them to the freight elevator, which he then operated to the first floor of the building; after which, he took the chairs and boxes to the sidewalk, where he and his guests used them in viewing the parade, which occupied a period of about three hours,—at the expiration of which time the lighting conditions within the building were identical with those which prevailed at the time when plaintiff procured the chairs and boxes as aforesaid. With regard to other pertinent conditions concerning the use of the freight elevator on that evening,—in accordance with the custom and the directions posted inside the "cage", to which reference hereinbefore has been had,—at the time when plaintiff took the chairs and boxes from the freight elevator, he left the elevator at the first floor, with its doors remaining open. However, it appears from the evidence that thereafter certain other tenants of the building had used the freight ele-

vator; that they had left the doors of the shaft on the first floor open; and that, designedly, and by other than normal means had operated the elevator and had succeeded in "parking" the "cage" at the third floor. In that connection, notwithstanding denials by such tenants of the assumed fact that they had operated the emergency switch, the inference is deducible that in bringing about the results to which reference just has been had, the emergency switch within the elevator "cage" had been operated,—whether by the designated tenants, or by some other tenant, being immaterial as far as the issue regarding that matter is herein concerned. After the parade was ended, plaintiff endeavored to return the chairs and boxes to his office and, in so doing, as he approached the freight elevator, he had an ordinary straight-backed office chair in each hand, one held under each arm—"one was in front of . . . [him] and one was behind. . . . [him]". His "eyes were open"; he was "facing towards the open elevator door"; and he was "looking through the elevator shaft from the door, to the back of the elevator". He did not light any matches, nor "put . . . [his] foot down to feel if the elevator—if the car was there". He did not put down "one of the chairs and feel anything". Plaintiff could see the "outline of the elevator door; . . . saw the open door . . . [but] could not see whether the elevator was there or not". Inside, it was "very dark". He "knew there was an emergency button there, but up to that time . . . did not know it [the elevator] would operate with the doors open". However, the "cage" was not there and plaintiff stepped into the open shaft, fell into the basement, and by reason thereof sustained injuries which constituted the basis for an action against the defendants for the recovery of a judgment for the damages thus sustained by him. From a judgment that was rendered pursuant to a verdict in favor of plaintiff, the defendants have prosecuted the instant appeal.

■ The first point that has been presented by the appellants is that the evidence establishes the fact that at the time when the accident occurred, plaintiff was "a mere licensee", with the result that unless he was wilfully or wantonly injured by the defendants, no cause of action existed in favor of plaintiff. In that connection the respondent asserts not only that he went upon the premises of the defendants on the invitation extended to him by the defendants'

building manager and for the purpose of viewing the parade, but also, as a matter of legal right derived from the relationship of landlord and tenant that existed between the defendants and plaintiff's employer. With respect thereto, as far as an assumed invitation having been extended by the defendants to plaintiff was concerned, the fact appears to be that although other tenants of the building had keys thereto, plaintiff—theretofore not having had any use for one—had never requested that such a key be furnished to him,—with the consequence that on inquiry by him directed to the manager of the building as to whether the building would be kept open on the night of the parade, plaintiff received the assurance that it would be kept open on that night. It is clear that if those facts were the only ones which were shown to be present in that connection, a question with respect to the relationship that existed between the parties might become one for serious consideration; but considering the fact that plaintiff, as manager of the business of a tenant of the building, stood in a position equal to that of an actual tenant thereof and had a legal right to be in the building at any time during either the day or night, and that he therefore needed no ''invitation'' from the management of the building to occupy either the rented offices of his employer or any part of the building that ordinarily was used by the tenants thereof,—the tendered issue must be determined against the contention of the defendants in that regard. Furthermore, the additional circumstance that at the time when the accident occurred plaintiff was not engaged in the enjoyment of any ''hospitality'' which possibly might have been extended to him on the part of the defendants' building manager,—but, to the contrary, that he was exercising an implied right of a tenant of the building, not only in the occupation of the rented office of his employer, but also in an attempt to return to such office, as freight, certain personal property of which his employer was the owner, to wit, the chairs and boxes which theretofore had been used by plaintiff and his guests in viewing the parade from the sidewalk, as aforesaid,—lends weight to the reasonableness of such conclusion.

The next general criticism of the judgment is that it is lacking in evidentiary support of the implied conclusion that is contained in the verdict of the jury to the effect that ''any negligence of the defendants proximately caused plain-

tiff's injuries". In that connection, obviously two questions are involved: First, whether the defendants were guilty of negligence; and, secondly, assuming that the first question should be answered in the affirmative, whether such negligence was a proximate cause of the accident. But as a foundation for a determination of the question whether the defendants were guilty of negligence, it is at least advisable to recall what general duty was owing by the defendants to the plaintiff. In that regard, the authorities uniformly appear to be to the effect that the defendants were required to use ordinary care. (See *Reuter* v. *Hill,* 136 Cal. App. 67, 72 [28 Pac. (2d) 390]; *Hamilton* v. *Union Public Market,* 15 Cal. App. (2d) 340, 342 [59 Pac. (2d) 459]; *Brown* v. *Pepperdine,* 53 Cal. App. 334 [200 Pac. 36]; *Spore* v. *Washington,* 96 Cal. App. 345 [274 Pac. 407]; *Gulley* v. *Traders Oil Corp.,* 102 Cal. App. 557 [283 Pac. 97]; *Bellon* v. *Silver Gate Theatres, Inc.,* 4 Cal. (2d) 1 [47 Pac. (2d) 462]; 15 Cal. Jur., p. 741.) In the case entitled *Spore* v. *Washington,* 96 Cal. App. 345, at page 350 [274 Pac. 407], the rule was set forth as follows: "Where a building is let in flats or offices, or otherwise leased to individual tenants between whom no privity exists, the hallways, entrances, stairways, or other fixtures not being demised to the tenants or any particular tenant, but used in common by all, the landlord owes a duty to those visiting the premises and entering such passageways to visit a tenant or at his invitation, express or implied, to use ordinary care to avoid injuring them as they are invitees of both landlord and tenant." Consequently, the question whether the defendants were guilty of negligence is determinable by a solution of its corrollary, that is, whether the defendants failed to exercise ordinary care for the protection and safety of plaintiff. The answer to that question, like that to most others, is not capable of demonstration; nor may it be declared with confidence in the exactness of such statement that because, in a given set of circumstances, specified conduct would amount to negligence, the same conclusion should be reached in all circumstances where the same act or conduct of the defendants may be shown to have been present. It becomes of some importance to bear in mind such preliminary and thoroughly understood observations, for the reason that the instant case does not deal with an ordinary situation that would or might arise with respect to a landlord and a tenant of an "up-

to-date'' office building, located in the heart of a large city; but, to the contrary, it has to do with a comparatively small building of a special type, located on the fringe of ''big business''. It is quite obvious that conveniences which might be furnished to tenants in the former type of building, and the attendant care for their safety and protection while in the enjoyment of such tenancy, would materially differ from those which would or might be expected or required by tenants in a building of the latter class. For example, one might reasonably assume that a first-class office building would maintain day and night passenger elevator service; that at all times the building would be kept well and thoroughly lighted and air-conditioned; and that watchman and janitor service would be furnished, which would include such inspection of halls and corridors that comparative safety in their use might be reasonably assured. But in a building such as was the one in which plaintiff's employer was a tenant, none of the conveniences such as those just enumerated would or might reasonably be expected to be furnished. To illustrate the existent situation in the instant case: At night, the building was not lighted; there was no passenger elevator service; the front doors of the building were locked; and, excepting at times when delivery of freight to a tenant was delayed beyond the usual business hours, the back door of the building was likewise barred. Such conditions ordinarily obtaining, no tenant of the building who sought to visit his offices at night would have a right to expect the same degree of care on the part of his landlord which otherwise might be required of him. But on the night of the parade, the conditions were somewhat changed. In effect, the defendants had ''invited'' plaintiff to view the parade from the building. To use the language of the defendants' building manager, he was ''entertaining''; he was engaged in fostering ''good will'' between the defendants and the tenants of the building. He and one of his office assistants were present to receive the so-called guests, and to insure their privacy by not permitting ''outsiders'' to enter the building. To that end, he had gone to the extent of lighting not only the front or ''display'' room of the building, but also the entire stairway and the lavatory adjoining the shipping room thereof. Having lighted the stairway, it becomes manifest that he had anticipated that the tenants, or some of them, might prefer to use their own front windows for the purpose

of viewing the parade. But, especially after a day's work, travel by way of stairs is not always deemed the most desirable method or means of arriving at upper floors of a building. Most people prefer to make use of an elevator for that purpose. The defendants' building manager knew that on occasions the tenants of the building used the freight elevator for passenger service. In reason, in the absence of the operation of the passenger elevator, it would seem that he well might have anticipated that the freight elevator would be pressed into service. In that connection, a separate situation requires consideration: Assuming that on the occasion in question the defendants' agent, or building manager, should have foreseen the likelihood that the freight elevator would be used for the purpose of carrying tenants to and from their respective offices,—in the exercise of ordinary care, what means should the building manager have adopted and employed for the safety and protection of such tenants? It would seem not unreasonable, as a measure of the degree of care to be required of the defendants, that both the freight elevator, and the approach thereto through the shipping room, should have been adequately lighted. But, as a matter of law, it may not be declared that, even though such lighting was furnished, the entire duty of the defendants necessarily ended. It may be remembered that, ordinarily, (and without the use of force) the entrance doors to the freight elevator shaft could not be opened at any floor of the building, other than the basement, if the floor of the elevator "cage" were not on a level with the floor at which an attempt might be made to open such doors. Nor could the elevator be operated if the entrance doors to the shaft were open at any other floor; but that each of such conditions was controllable by means of an emergency release which could be set in operation by pressure on a button that, in accordance with the requirements of a safety order of the industrial accident commission, was located within a glass-covered box within the "cage". The manager of the building had undertaken the task of "entertaining" the tenants thereof; and he personally knew, or should have known, not only that the freight elevator might be used by them, but also of the conditions under which such operation might be made. He knew, or should have known, that neither the shipping room nor the freight elevator was lighted; and, had he given the freight elevator proper inspection, he would

have discovered the fact that the emergency release was not protected from indiscriminate and untimely use by a tenant, or any other person, with the almost certain result that the entrance doors to the elevator shaft on any floor of the building might be left open without the "cage" of the elevator being at the floor at which such doors were open. Considering all the facts hereinbefore set forth, including the further facts that neither the shipping room nor the freight elevator was lighted, and that defendants' building manager had knowledge of the fact that the glass covering of the emergency release button had been broken, and, as a consequence thereof, there was nothing to prevent the possible use of the emergency release, and thus remove from effective operation the devices and appliances with respect to the proper opening and closing of the doors of the freight elevator which theretofore had been provided for the safety and protection of the tenants of the building,—it would seem clear that an appropriate question had arisen as to whether the defendants had failed in their duty to exercise ordinary care in the premises.

With respect to the contention of the appellants that, assuming (without conceding) they had been guilty of negligence, it did not appear that such negligence was the proximate cause of the accident, it need only be said that, aside from the possibility of the contributory negligence of plaintiff, the happening of the accident properly may be attributed to no other cause. It is inconceivable that, in the absence of some negligence on the part of the defendants, the accident would have occurred. In other words, had the building been adequately lighted; had the emergency release switch been properly protected from unwarranted use; or had the first floor of the building been timely inspected for the purpose of determining that the entrance doors to the freight elevator shaft were not left open at a time when the "cage" was not on a level with the floor thereof,—the likelihood of the happening of the accident would have been most improbable and remote. But, after all, the question whether the admitted conduct on the part of the defendants constituted negligence was one of fact to be determined, in the first instance at least, by the jury. (*McKeon* v. *Lissner*, 193 Cal. 297 [223 Pac. 965]; *Williamson* v. *Hardy*, 47 Cal. App. 377 [190 Pac. 646]; *Roach* v. *Wells Fargo Bank & Union Trust Co.*, 102 Cal. App. 380 [282 Pac. 967]; *Long* v. *John*

*Breuner Co.,* 36 Cal. App. 630, 636 [172 Pac. 1132]; 19 Cal. Jur., p. 719.) Its finding thereon and its implied decision that such lack of reasonable care, including inspection of the premises, was the proximate cause of the accident, are conclusive on this court.

Likewise, the question of the asserted contributory negligence of plaintiff was for the jury. (*McKeon* v. *Lissner,* 193 Cal. 297, 304 [223 Pac. 965]; *Jacobi* v. *Builders' Realty Co.,* 174 Cal. 708, 711. [164 Pac. 394, L. R. A. 1917E, 696]; *Muller* v. *Hale,* 138 Cal. 163, 167 [71 Pac. 81]; 19 Cal. Jur., p. 735; *Oles* v. *Kahn Bros.,* 81 Cal. App. 76, 81, 82 [253 Pac. 158]; *Roach* v. *Wells Fargo Bank & Union Trust Co.,* 102 Cal. App. 380 [282 Pac. 967].) In the case entitled *Jacobi* v. *Builders' Realty Co., supra,* the action was brought to recover damages for the death of a person which occurred while she was attempting to use an automatic elevator in an apartment building. The defendants contended the deceased herself was guilty of negligence in not looking to see if the cage was in place when she opened the door of the elevator. The court in that case said that " . . . persons intending to use the elevator came to rely, and to a certain extent were entitled to rely, upon the fact that if they could open the door at all it would be because the cage was there". The court further observed that, "Since knowledge of the defects in construction or in operation, or both, was not only chargeable against this defendant, but was actually possessed by it, it is too plain for discussion that, in inviting tenants and their guests to use such a contrivance, it was sheer negligence not at the same time to have adequately warned and protected them against dangers necessarily attendant upon the use of the elevator under this defective faulty construction or lack of repair. . . . The deceased unquestionably opened this door or found it open. In either case (there being no attendant to warn or any other kind of warning given) it was not at least unnatural that she should have placed reliance upon the conditions which she found. Whether, under these circumstances, she should also have looked or be convicted of negligence, presents a question of reasonable argument *before a jury,* but one which cannot be resolved against plaintiff as matter of law. . . . " So, in the instant case, the question whether plaintiff's conduct in the premises might fairly be said to have shown that he had been negligent in the sense that he had failed to use that

degree of care which would have been used by an ordinarily prudent person was submitted for the consideration of the jury, and by its verdict, the pronouncement of the jury in effect was that plaintiff was "not guilty". Unless, as a matter of law, this court may properly declare that his acts and conduct were such that an ordinarily prudent and careful person would not have done the things that plaintiff did,—the conclusion that was reached by the jury is final. In that regard, the rule is stated in the case entitled *Olcese* v. *Hardy*, 40 Cal. App. 323, 329 [180 Pac. 666], that: "There is no fixed standard for the sufficiency of evidence to induce belief, and unless the evidence so clearly preponderates against the verdict that the court cannot conclude that the verdict was the result of a due consideration of the evidence, the verdict will not be disturbed." Again, in the recent case entitled *Parker* v. *Manchester Hotel Co.*, 29 Cal. App. (2d) 446, at page 455, [85 Pac. (2d) 152], the court quoted the rule as follows: " 'Contributory negligence is a question of law only when the court is impelled to say that from the facts reasonable men can draw but one inference, and that an inference pointing unerringly to the negligence of the plaintiff contributing to the injury . . . in all other cases the question of contributory negligence is a question of fact for the jury.' " (See, also, *Norton* v. *Central Surety & Ins. Co.*, 9 Cal. App. (2d) 598 [51 Pac. (2d) 113]; *Smellie* v. *Southern Pac. Co.*, 212 Cal. 540 [299 Pac. 529].) Without again reciting the evidence regarding plaintiff's acts, including the inferences that might have arisen therefrom,—in the light of all the circumstances shown to have existed in the case—from a legal standpoint, this court is unable to reach a conclusion with reference to plaintiff's conduct which would be in opposition to that which impliedly was declared by the jury.

In addition to the foregoing considerations, the appellants present the point that, notwithstanding the possible existence of negligence on their part, by his use of the shipping room and the freight elevator, plaintiff assumed the risk of injury to himself; and that, as a consequence thereof, the judgment should be reversed. As hereinbefore has been stated, it reasonably could have been anticipated by the manager of the building that on the occasion in question both the shipping room and the freight elevator would be used by the tenants and their guests. But, even conceding

the applicability of the doctrine of "assumed risk" to the instant case, it is clear, with reference thereto that the determinative question was whether, in consideration of all the circumstances, plaintiff conducted himself as a reasonable and prudent person. (*Pope* v. *Halpern,* 193 Cal. 168, 175 [223 Pac. 470] ; *Peccolo* v. *City of Los Angeles,* 8 Cal. (2d) 532, 538 [66 Pac. (2d) 651].) " . . . One who knows,· or as a reasonably prudent person ought to know, of a danger, may not place himself in its way, or proceed in spite of the danger, and yet recover from the one responsible for the dangerous condition. . . . But one is required to act in such circumstances only as a reasonable and prudent person, and, it is said, owing to the conditions of modern life, is required to incur a certain amount of risk in almost every act committed." (19 Cal. Jur., pp. 583, 585.) Furthermore, it has been said, in effect that " 'The fact that one voluntarily assumes a certain degree of risk is not conclusive of negligence.' " (*Rasic* v. *Schultheiss,* 121 Cal. App. 560, 570 [9 Pac. (2d) 550] ; *Commonwealth Bonding & Casualty Ins. Co.* v. *Pacific Elec. Ry. Co.,* 42 Cal. App. 573 [184 Pac. 29].)

And before it can be said that one has "assumed the risk" of a specified hazard, it must be shown that he had knowledge of the condition creating the hazard. One does not assume the risks of danger which he has no reason to anticipate. (*Williamson* v. *Fitzgerald,* 116 Cal. App. 19 [2 Pac. (2d) 201].) In the instant case the plaintiff testified he did not know that the elevator could be moved from the first floor if or when the doors thereto were open. The evidence showed that the normal position of the elevator, when it was not in use, was at the first floor, with the doors to the shaft left open. The plaintiff also knew of the sign posted by the defendants inside the "cage", directing that it be returned to the first floor when not in use, and he knew that normally it could not be stationed at any floor other than the first floor when the doors to the shaft on that floor were open. On the occasion in question plaintiff left the elevator at the first floor with the doors open and returned later to find the conditions apparently the same. The question of knowledge and appreciation of a danger or the lack thereof in an action of this nature is ordinarily one to be determined by the jury from the facts of the case. (*Meindersee* v. *Meyers,* 188 Cal. 498 [205 Pac. 1078] ; 19 Cal. Jur., p. 585.) In the case of a freight elevator, the

question whether an employee had assumed the risk of injury from falling was held to be for the jury, where there was a rule against riding on the elevator, but it was customarily disregarded by the manager and the employees. (10 Cal. Jur., p. 220; *Goggin* v. *D. M. Osborne & Co.*, 115 Cal. 437 [47 Pac. 248].) Likewise, the knowledge of an employee that the elevator which it was necessary for her to use was frequently in disrepair was held not to be sufficient of itself to charge her with an assumption of risk in traveling on it, where it had never exhibited a condition known to be dangerous. (10 Cal. Jur., p. 220; *Rogers* v. *Ponet*, 21 Cal. App. 577 [132 Pac. 851].) Under appropriate instructions which were given by the court to the jury in the instant case, the question of the alleged assumption of risk by the plaintiff was submitted to the jury, and its implied answer thereto was in favor of the plaintiff. As a matter of law, this court is unauthorized to disturb that conclusion.

 Although the appellants complain of the failure on the part of the trial court to give to the jury certain instructions which were offered by the defendants,—also, because at the request of plaintiff the trial court gave to the jury certain other instructions which the appellants assert were erroneous, this court is unable to discern that either by the giving of the latter instructions, or by the refusal to give the former, to the jury, the defendants were prejudicially affected. The instructions that were given to the jury were fair and the jury could not have been misled by them in any respect.

The judgment is affirmed.

Curtis, J., Edmonds, J., Shenk, J., and Langdon, J., concurred.

Rehearing denied.