[Civ. No. 2896.   Fourth Dist.   Aug. 20, 1943.]

CLAUDE PIERCE, Respondent, v. JOHN B. SINNER et al., Appellants.

Monroe & McInnis, for Appellants.

J. K. Stickney, Jr., Frank H. Nottbusch and Stickney & Stickney for Respondent.

GRIFFIN, J.—Defendants and appellants John B. Sinner and Oscar A. Sinner, are partners, doing business as Sinner Brothers, and were engaged in the contracting business. They were the general contractors employed to remodel a cathedral located in San Diego. As a part of the work to be done, the outside of the building was changed and resurfaced. There were numerous buttresses projecting from the outside walls of the building, between which appeared recesses. It was

while he was working upon the surface of one of these recesses that plaintiff and respondent was injured.

Plaintiff was a plasterer employed by the plastering subcontractors, Larson Brothers. Lester A. Larson was one of the members of that firm. Sinner Brothers, under its general contract, was required to build, construct, maintain and make the necessary changes in the scaffolding which was used by the plasterers and others in doing the work required to be done. The resurfacing of the building was done by the "gunnite process," with a machine designed for the purpose, which forced heavy plastering material through a hose to a nozzle and the gunnite crew operated the nozzle so as to spray the material under pressure upon the outside of the building. This gunnite material dried quickly, but before it was set it was necessary to smooth out the rough places which were a usual and customary incident of the gunnite process. This smoothing was the work of the plasterers. They followed the gunnite crew and, working from the scaffold, reached the wall surface and put the final touches on the gunnite finish. In doing this work it was customary for the plasterer to use a tool known to the trade as a rod.

Defendant John B. Sinner testified concerning the details of the scaffold, as constructed by him. He identified the model which he had made to illustrate its construction. Witnesses on behalf of the plaintiff disputed his testimony in this regard, and although they admitted that this model correctly portrayed the scaffold as it was originally built, they contended that the scaffold had been changed and portions thereof removed shortly before the accident, as portrayed by a model made and identified by Lester A. Larson. All of plaintiff's witnesses agreed that Larson's model was correct. As originally constructed, and as illustrated by Mr. Sinner, the scaffold had an additional platform which extended into the recess between the two buttresses. The scaffold, as described by plaintiff's witnesses and illustrated by the model, did not have such extension, but the planks forming the platform extended outside of the buttresses. Originally, the scaffold was a regulation, pole-type scaffold. The "uprights" were 4"x4". The ledger boards were 1"x8". The planks for the flooring of the scaffold were 2"x10" and 16' long. At the time of the accident there were two planks constituting the lower floor or tier of the scaffold which were laid about six feet from the ground and about four feet from the recess walls. The scaf-

folding as originally constructed was too close to the building for the use of the gunnite men and the plasterers. The evidence would indicate that it was at Larson's suggestion that the defendants made the change in the plans of the original scaffold, and three tiers were rebuilt by them. Defendants maintain otherwise.

Just prior to the time of the accident here involved Mr. Larson and plaintiff had been smoothing the cement and marking it off in squares on the first floor or tier of the scaffold. Plaintiff found that it was necessary to have additional platform laid into the recess before he could reach in and finish the work in that corner. He notified Larson of his inability to reach into the recess from the scaffold as thus constructed. Larson then called down to the defendants' workmen: "Somebody get something in that angle so we can work it out." It had been defendants' previous instruction to Larson that if any planks were to be moved or rearranged for him, he should notify defendants and they would have their workmen do it. Thereafter, one of defendants' workmen (Homsma) who was on the ground, started to select from the lumber around the building, some boards with which to erect an additional platform for Larson and the plaintiff. One Smith, who had been working with the gunnite crew and who was then on the ground, heard the request of Larson. He testified that Homsma "started to get up on the scaffold"; that he was awfully slow; that the gunnite was drying; that he, Smith, climbed up there and told Homsma to hand "me the planks up," and that he handed him a 2x4 and a 2x10, each about 8 feet long; that he laid them on the scaffold as "near the corner as he could get them"; that he laid the 2x4 flat, rather than on its edge; that it ran "from the inner platform board . . . in about a 45 degree angle over to the ledger board"; that the 2x10 was laid "practically perpendicular to the building, the end of it about even with the outside of the scaffold, and the other end a little farther from the recess than the ledger board, and this 2x10 is practically across the center of the 2x4"; that after he laid the boards he then went on with his gunnite work; that he did not pay any particular attention to the 2x4 when it was handed up to him; that he "never really looked at it. They was in a hurry, so I just laid it up there." While he was thus placing the boards, Larson went around to the front of the building.

Plaintiff testified that while this operation was going on

he continued with his plastering work; that he did not see the boards laid or who laid them; that Larson returned, asked for the rod, and indicated to plaintiff, who weighed about 200 pounds, to stand on the outward end of the 2x10; that he did so and Larson stepped across to the other end, finished the recess plastering, and just as he was about to turn, the 2x4, over which the 2x10 had been placed, broke; that Larson fell to the ground unhurt; that plaintiff fell over backwards and was severely and permanently injured. The accident happened on Sunday. Sinner Brothers were pressed for time and had requested the plasterers and the gunnite men to work on that day in order to meet a deadline. The gunnite men were paid by Sinner Brothers but the gunnite equipment was rented from one Woods. No carpenters were present on the outside of the building when the necessity for additional timbers became apparent. Oscar Sinner was a carpenter and was inside of the building directing the work there. John B. Sinner was on the outside of the building engaged in general supervision of the work. No broken 2x4 was found after the accident. John B. Sinner testified that he looked for one but did not see any around; that there were several 2x4's around the building; that he did not authorize Smith, the gunnite man, to rebuild or reconstruct the platform in the manner indicated; that he did not see nor inspect the lumber placed thereon for that purpose, and that he did not see plaintiff fall, although he was about 15 feet from him at the time; that he rented the gunnite men and equipment by the day and paid them and carried insurance on them; that he directed their work but did not have the right nor power to discharge them; that Woods gave no instructions to him regarding their work while they were employed on that job. Other witnesses testified that they saw the 2x4 break, but did not examine it for imperfections or defects. Apparently, as a result of the imperfection in the 2x4 or in the manner in which it was laid, plaintiff received severe injuries. Plaintiff recovered judgment against defendants in the sum of $10,000. Defendants appealed.

They now contend first, that the evidence is not sufficient to show that Smith was, at the time, an employee of defendants and acting within the scope of his employment. Second, that the evidence is not sufficient to show negligence on the part of defendants mainly because there is no evidence to show (a) that the 2x4 was in fact defective; or (b) that if

it was defective, that such defect was known, or by the exercise of reasonable care should have been known to defendants; or (c) that the facts and conditions which brought about his injuries were not equally known to plaintiff. Third, that the plaintiff was guilty of contributory negligence as a matter of law.

Considering the evidence on the first point presented, the record shows, in addition to the facts already stated, that defendants rented Woods' equipment by the day. The employees, including Smith, who usually operated the gunnite machine for Woods, operated that equipment on this particular contract.

Sinner testified in this respect that "they were the same as his employees," except that he "couldn't perhaps have fired them if Mr. Woods hadn't wanted it and had said 'They are my men. They are my employees, and they are going to stay here' "; that he had the power to tell them "when to work . . . how to do it, and how to do their work"; that he exercised that power "during the entire period of this work"; that when these men worked on Sunday they were working at his direction. Larson testified that on previous occasions he had observed Smith "fixing up the scaffold"; that "as the work progressed around the building, anyone available, that is, from the gunnite crew and the labor crew, would change the scaffold and move planks etc. from time to time. I would say hundreds of times."

Sinner testified that it was the job of the gunnite men and the plasterers to remove the planks "for the purpose of clearing away for the gunnite that doesn't attach itself to the wall."

A gunnite workman testified that he was the one who told Sinner that in order for him to "shoot this particular place" Sinner would have to remove "that scaffolding that was there and set it back away from the wall"; that he had never seen plaintiff place any scaffolding but that Sinner's men would do it for him; that the scaffolding throughout the whole job "was good outside of this one point where the accident happened"; that on another occasion a scaffold gave away and slipped off the building; that another gunnite man "was up there moving plank or something."

In respect to the scaffolding, plaintiff testified that he did not have anything to do with the placing of any boards in the recesses; that that work was done by laborers working

for Sinner; that part of the time one of the gunnite laborers would do it; that he had seen Smith do it on numerous occasions before the accident over a period of three months and while Sinner was around; that on occasions when there were no carpenters around he had asked Sinner to place planks on the scaffolding for him; that in response thereto Homsma, Smith and other gunnite men would do that work for him on "numerous occasions" and that that was their "usual and customary practice."

In this respect it is mainly argued that because Sinner did not have the right to "fire" Smith and because Smith was not then doing work which he was employed to do, Smith should not therefore be considered as authorized to bind Sinner for any negligent act of his in the selection of the proper materials and in the construction of the makeshift platform, citing such cases as *Lowell* v. *Harris*, 24 Cal.App.2d 70 [74 P.2d 551]; and *Billig* v. *Southern Pacific Co.*, 189 Cal. 477 [209 P. 241].

The first cited case holds directly that the existence of the right of control over the employee is the critical test of liability for his acts, and that it is the right to exercise control rather than the mere fact of its exercise which is decisive. While the right of Sinner to discharge the gunnite employees in the instant case under the facts appearing may be subject to question, nevertheless, any presumption arising from that fact alone is sufficiently overcome by the remaining evidence and fully supports the jury's conclusion, which was reached after hearing proper instructions on the subject, that Smith, as well as Homsma, were employees of defendants at the time in question and that each was acting within the scope of his employment. (*Peters* v. *United Studios, Inc.*, 98 Cal.App. 373 [277 P. 156]; *Callahan* v. *Harm*, 98 Cal.App. 568 [277 P. 529]; *Silberman* v. *Industrial Acc. Com.*, 21 Cal.2d 609 [134 P.2d 228].)

Considering the negligence of defendants, it must be conceded that plaintiff was severely injured and that such injury was the result of a negligently constructed, makeshift platform, or as the result of the negligent selection and use of defective material in its construction. The question then presented is this: By whose negligence was such injury brought about? The evidence justifies the inference that the jury might have concluded that the defendants' agents negligently placed the 2x4 with the flat side down rather than on

edge and that if it had been laid on edge under the circumstances related, it would not have broken. There is evidence that had it been laid on edge rather than flat, "it would be at least three times as strong." There is other evidence that might indicate that one end of the 2x4 might have been negligently laid too close to the edge of the ledger board and the weight of the workmen caused it to slip rather than break. The evidence also shows that on the two tiers above, where the plasterers had "those bad reaches," a similar method was used by defendants' employees in constructing a similar makeshift platform on the tiers above. One witness testified in this respect that "It would be a very short job to stick it up there and tack it (the 2x4). It had been done before." The evidence would indicate that on this particular occasion the 2x4 was not nailed as compared to the practice of nailing it down on the tiers above. It might also well be argued that the 2x4 was in fact defective and that it did break. The jury might well have concluded that defendants' agents were negligent in failing to make a reasonable examination of the material to be used considering the weight it had to carry and the purpose for which it was to be used. Defendants' employees were in better position than plaintiff to know the character of the material used and were the ones who made the selection and placed the material there. This would factually differentiate the instant case from the case of *Dingman* v. *A. F. Mattock Co.*, 15 Cal.2d 622 [104 P.2d 26], relied on by defendants. There it was said: "If there were any evidence whatever in the case showing that the contractor or his foreman or other employee placed the board over the open space or in any other way had an opportunity other than that possessed by the respondent to observe said board and to note any defect therein, then the case might be different. . . ." The evidence supports the finding that the negligence of defendants was at least *a* proximate cause of the accident and injury. Whether negligence is a proximate cause of the injury is almost entirely a question of fact. (*Fennessey* v. *Pacific Gas & Electric Co.*, 20 Cal.2d 141, 145 [124 P.2d 51].) Plaintiff testified that he had no part in the selection of the timbers or in laying them; that he was busily engaged in his work of plastering while they were being laid. Assuming the truth of this statement, it cannot therefore be said that he had equal knowledge with defendants' workmen, of the facts and conditions which brought about his injuries.

█ It may likewise be said, as to the third point, that it cannot be held, as a matter of law, under the evidence, that plaintiff was guilty of contributory negligence. The question of the contributory negligence of plaintiff was fully argued to the jury and was a fact for it to determine under proper instructions. We cannot now interfere with that determination on this appeal. (*Douglass* v. *Crabtree,* 57 Cal.App.2d 568 [134 P.2d 912]; *Fischer* v. *Davis Standard Bread Co.,* 134 Cal.App. 1 [24 P.2d 538].)

█ During the trial there was offered and received in evidence the regulations of the Industrial Accident Commission regarding the construction of scaffolds. Defendants assigned the admission of these regulations as error. Sinner testified that he had read and was familiar with the contents of these orders and that he constructed his scaffolds in accordance with the standards therein specified. Even if we held that the court's ruling was erroneous, which we do not, it cannot be said that such ruling was prejudicial. (*Brumhall* v. *Sutherland,* 110 Cal.App. 10, 14 [293 P. 672]; *McKeon* v. *Lissner,* 193 Cal. 297 [223 P. 965]; *Hayden* v. *Paramount Productions, Inc.,* 33 Cal.App.2d 287 [91 P.2d 231]; *DeGraf* v. *Anglo California National Bank,* 14 Cal.2d 87 [92 P.2d 899].)

Defendants charge that respondent's counsel was guilty of prejudicial misconduct in his argument to the jury. This accusation was fully presented to the trial court on a motion for new trial. That court properly held that the claim was without foundation. (*Mudrick* v. *Market St. Ry. Co.,* 11 Cal.2d 724, 738 [81 P.2d 950, 118 A.L.R. 533]; *Roddy* v. *American Smelting etc. Co.,* 34 Cal.App.2d 457, 460 [93 P.2d 841].)

Judgment affirmed.

Barnard, P. J., concurred.

A petition for a rehearing was denied September 8, 1943, and appellants' petition for a hearing by the Supreme Court was denied October 18, 1943.