**Leo J. ZIMMER, Plaintiff,**

v.

**CALIFORNIA COMPANY, Defendant.**
Civ. No. 1940.

United States District Court
D. Montana,
Havre-Glasgow Division.
July 6, 1959.

Mahan & Mahan, Helena, Mont., for plaintiff.

Toomey & Hughes, Helena, Mont., for defendant.

JAMESON, District Judge.

Plaintiff seeks damages for injuries sustained on November 5, 1956, while working on the installation of a housing unit over the pump of an oil well owned by defendant and known as the Grimm well. Plaintiff was employed as a laborer or "roustabout" by L & L Production Service, an independent contractor. The other members of the L & L crew were Ervin Kaatz, foreman, and Robert Larsen. The pumping unit itself had been installed previously by the same L & L crew and was operating at the time of the accident. Between installation of the pumping unit and housing unit, the L & L crew had worked elsewhere in the oil field.

The pumping unit included counter weights and an engine which applied power to operate the pump by means of V-belts. The L & L crew was building forms for the concrete footing on which the house would be placed. Larsen had gotten into the path of one of the counter weights. Plaintiff saw his predicament and warned him. Larsen lurched forward (partly on his own power and partly from being struck by the counter weight), bumping plaintiff, who lost his balance and caught his right arm in the V-belt. His arm was drawn around the engine's pulley. The accident occurred about 2:00 o'clock p.m.

D. J. Magraw, defendant's field foreman at the oil field, had an office approximately 100 yards from the Grimm well. Kaatz ordinarily checked with Magraw each morning to see what work should be done that day. Magraw believed he had discussed the making of the forms with Kaatz the morning of the accident. Ed Jensen was employed by defendant as a "pumper gauger" to service the pump engines and check the daily production of the wells.

Ordinarily V-belt guards were installed at the time the engine was ready to operate, and before the house over the engine was erected. In this instance, however, this was not done because the pumping unit had arrived without the usual guard. It was Magraw's responsibility to arrange for guards. He decided to have welders make the necessary guards because that would be cheaper and faster than ordering new ones. The engine had been operating without guards for the greater portion of three weeks prior to the accident. For a few days the natural flow was sufficient without pumping.

Magraw testified that it was his recollection that he told Kaatz to shut down the engine while installing the house, and that when he got through, if the pumper (Jensen) were not available, to start it himself.[1] Kaatz testified that it was part of his job to know how to start and stop pump engines, but he could not

---

[1] On this point Magraw testified:

"Q. And could you describe your conversation? A. As best as I can remember is that I told him to go ahead and get the forms ready to pour the concrete for the engine house base, and it came up about the unit and I told him at the time to shut the unit down and when he got through if the pumper wasn't around to go ahead and start it up.

"Q. And the pumper was Mr. Jensen? A. Yes, sir.

"Q. Would it have been necessary in any event to shut the pump down to do work that was contemplated that day? A. Yes, sir.

"Q. And would you explain why? A. If the unit were running no one could get in near the base to put in the front side of the forms because of the proximity to the arc of the counter weights."

recall whether Magraw told him that he should shut the engine down when he saw fit. Kaatz testified further that he felt free to turn the engine on and off if it was "hazardous in any way".[2] Neither plaintiff nor Larsen had any authority to turn off the engine, did not know how to start or stop it, and had never done so.

Two days prior to the accident Kaatz, Zimmer and Larsen went to one of defendant's wells in North Dakota for the house to be installed at the Grimm well. In order to disassemble the house, it was necessary to remove the guard over the V-belt running from the engine to the pumping unit. On this occasion Kaatz shut down the engine for about one-half hour while the guard was being removed, and later restarted the engine.

Plaintiff and Larsen both testified that the engine at the Grimm well had not been shut down on November 5th prior to the accident. Magraw testified that he noticed that the pump was not running at about 10:00 a.m. and also that it was not running at about 1:00 p.m.; and that he did not know that the engine

had been started until Larsen told him about Zimmer's accident about 2:00 or 2:30 p.m. He did not know who started the pump, but testified that he did not turn the engine on or off on the day of the accident.

Kaatz testified that they had started making the forms on the opposite side of the engine from where plaintiff was injured. In order to start the forms on that side, it was necessary to remove drip pots which in turn required the engine to be turned off. He recalls moving the drip pots, turning the engine off, and turning it on again, but he did not recall how long before the accident he had restarted the engine.[3]

Magraw testified that railings or guards for the east and west sides of the counter weights had been completed and temporarily placed in position prior to the accident, and that the east railing had been moved out when he looked at the pumping unit after the accident. According to Kaatz, either he or some member of his crew moved the counter weight guards on the east side of the unit (where the accident occurred) to

2. On cross-examination Kaatz testified:
"Q. Do you recall Mr. Magraw telling you you could turn the machine off if you had to, from your personal recollection? A. I don't recall it, but I have never ever—I was never ever told that I couldn't shut it down when I saw fit for protection."
On re-direct, Kaatz said:
"Q. Did you feel free when working on these wells to turn the engine on and off as you saw fit? A. If it was hazardous in any way to any certain extent I felt myself I had a right to, to complete the job."

3. Kaatz' testimony relative to stopping and starting the engine on the day of the accident includes the following:
"Q. Would you state whether or not you moved that drip pot? A. Yes, we moved it.
"Q. Why did you move it? A. In order to have room to work with our forms and get our forms the way we would like them.
"Q. And did you turn the engine off? A. At that time, yes, I had to.

"Q. Was it necessary to do so? A. If I moved the pot it wouldn't run without a fuel supply and that was the main source of fuel supply.
* * * * *
"Q. Was it you yourself that turned this engine off? A. Yes.
"Q. And what did you have to do in order to turn the engine off? A. Just pulled the clutch and shut off the switch, or I may have left the motor idling, I am not sure. As a rule I shut it off. I couldn't say on that, I am sorry, it wouldn't run without gas, so it had to be shut off.
* * * * *
"Q. Do you recall restarting the motor that day? A. I recall restarting it, but I don't recall what time.
"Q. Why did you restart it? A. To put the well back into production.
* * * * *
"Q. Had you theretofore restarted the engine? A. Yes, I had to start it sometime before the accident, but I couldn't say when.
"Q. You do not know how long? A. No, I don't. I just couldn't say."

make it easier to get at the forms.[4] Plaintiff and Larsen did not recall these counter weight guards.

Jensen serviced the pump engine daily and usually turned the engine off while doing his work. He recalled that the pump was running when he checked it on the morning of November 5th, but he could not recall whether it was running when he made out his gauge report in the office around 10:00 a.m. He was at another well about two and one-half miles away when the accident occurred. To the best of his recollection Jensen did not turn the engine on or off the day of the accident, but he could not "remember for sure".

L & L Production Service had qualified under the Workmen's Compensation Act of the State of Montana, and pursuant thereto plaintiff received compensation and effected a final compromise settlement.[5]

Plaintiff contends that defendant had control of the pumping unit at all times; that defendant was negligent in not providing plaintiff with a safe place to work and, more specifically, that defendant was negligent (1) in operating the pumping unit while the L & L crew was working on the housing forms, and (2) in operating the engine without first placing guards, screens and railings around the V-belts, pulleys and counter weights. Defendant contends that L & L Pro-

duction Service, through its foreman, Kaatz, had control of the pumping unit at the time of the accident; that defendant was not negligent; that the acts of plaintiff's fellow employees were the proximate cause of plaintiff's injuries, that plaintiff was contributorily negligent, and assumed the risk, and that the accident was unavoidable as far as defendant was concerned.

■ It is undisputed that defendant was the owner of the well, including the pumping unit and all attachments, and the products of the well; that it was the responsibility of defendant, through its foreman Magraw, to install guards over the engine; and that the pump had been operating, more or less continuously, for approximately three weeks without the guards. It is likewise undisputed that L & L Production Service, plaintiff's employer, had been engaged as an independent contractor to install both the pumping unit and the housing over the unit. Defendant's foreman, Magraw, gave directions to L & L foreman, Kaatz, with respect to what work should be done, but there is no evidence that Magraw exercised any supervision or control over the actual performance of the work by Kaatz and the other members of the L & L crew.[6]

There is a dispute as to whether it was the obligation of defendant, the independent contractor, or both, to turn off

4. From Kaatz' direct examination:

"Q. And where did the accident happen? A. It happened right down there at the corner where it shows the counter balance away from the unit.

"Q. Had you or any member of your crew moved the counter weight-guard on the east side of that unit? A. I don't remember who did it, or if I did it. I couldn't tell you.

"Q. One of your crew did it? A. Yes, it was me or one of my crew.

"Q. What was the purpose of moving it? A. To make it a little more handy to get at the form.

"Q. Was it interfering with the forming? A. There could have been a way of doing it without moving it, but that was the course we took was to set it back."

5. This does not preclude an action against a third party wrongdoer. R.C.M.1947, § 92–204 provides that whenever an employee "shall receive an injury while performing the duties of his employment and such injury" * * * is "caused by the act or omission of some persons or corporations other than his employer" the employee "shall, in addition to the right to receive compensation under the workmen's compensation act, have a right to prosecute any cause of action he may have for damages against such persons or corporations, causing such injury". § 92–205 provides that in "any such action * * * all defenses that would be available to defendant but for the workmen's compensation act shall be available as defenses * * *."

6. This, of course, is the principal test in determining the independent contrac-

the engine while installing the housing unit. I think it is clear from the evidence that neither defendant nor L & L had exclusive control over the operation of the engine. Magraw, Jensen and Kaatz had all on occasion turned the engine on and off. The testimony, however, supports the conclusion that Kaatz was the only person who did in fact turn the engine off and on again the day of the accident.[7] It is also undisputed that he had stopped the engine at the North Dakota well and restarted it two days before the accident. Plaintiff and Larsen were present on both occasions.

It was agreed at the pre-trial conference that plaintiff was a business guest or invitee of the defendant, and that defendant owed to plaintiff the duty of reasonable care. It was agreed further that the defenses of contributory negligence, fellow servant doctrine, and assumption of risk, are available to defendant. Plaintiff contends, however, that defendant had retained control of the premises, including the pumping unit, and by reason thereof, safety provisions prescribed by Montana statutes for employers are applicable.

■ The statutory provisions,[8] however, relate specifically to employers and employees and are included in the Code as a part of the Workmen's Compensation Act. I can find nothing in the statutory safety provisions relating to any duties on the part of any one other than an employer. It is my opinion that these provisions are not applicable and do not extend the duty owed to an independent contractor and his employees by a contractee, even where the contractee retains complete or partial control of the premises.

■ The general rule, with respect to the liability of possessors of land to business visitors, is stated in Restatement, Torts, § 343, as follows: "A possessor of land is subject to liability for bodily harm caused to business visitors by a natural or artificial condition thereon, but only if he

"(a) knows, or by the exercise of reasonable care could discover, the condition which, if known to him, he should realize as involving an unreasonable risk to them, and

"(b) has no reason to believe that they will discover the condition or realize the risk involved therein, and

"(c) invites or permits them to enter or remain upon the land without exercising reasonable care (i) to make the condition reasonably safe, or (ii) to give a warning adequate to enable them to avoid the harm."

■ The rule in Montana was well summarized by the Montana Supreme Court in Cassady v. City of Billings, Mont.1959, 340 P.2d 509, 510: "It is well-established in Montana that a landowner is obligated toward an invitee to either use ordinary care to have the premises reasonably safe, or to warn the invitee 'of any hidden or lurking danger therein'. Milasevich v. Fox Western Montana Theatre Corp., 118 Mont. 265, 270, 165 P.2d 195, 197, and see Restatement, Torts, Negligence, § 343. He is not an insurer against all accidents and injuries to such persons while there. Milasevich v. Fox Western Montana Theatre Corp., supra."

■■ In Chichas v. Foley Bros. Grocery Co., 1925, 73 Mont. 575, 236 P. 361, the court held that "an owner or occupant of lands or buildings, who directly or by implication invites or induces others to go thereon or therein, owes to such person a duty to have his premises in a reasonably safe condition, and to give warning of latent or concealed perils." 236 P. at page 363.[9] While there are no

---

tor relationship. See Barovich v. City of Miles City, Mont., 340 P.2d 819, and cases there cited.

7. With respect to the day of the accident, Kaatz testified positively that he had turned the engine off and on again. Ma-

graw was sure he did not turn it off or on, and Jensen did not recall doing so.

8. R.C.M.1947, Title 92, Chap. 12, §§ 92–1201 to 92–1222, inclusive.

9. See also Osterholm v. Boston, etc. Min. Co., 1910, 40 Mont. 508, 107 P. 499;

Montana cases precisely in point, involving the duty to an independent contractor and his employees, it is my opinion that the Montana court would follow the general rule that the contractee owes to the employee of the independent contractor the same duty which he owes to any invitee or business visitor lawfully on the premises.[10]

 In the instant case there were no "latent or concealed perils" or "hidden or lurking dangers". The fact that the pump was running with unguarded V-belts was open and obvious. Plaintiff had worked on the installation of the pump. While this was the first pump on which he had worked, he was acquainted with machinery and moving parts and was aware of their danger.[11] Where it is obvious that injury would probably result from contact with a machine while it is in motion and it would be unneces-

sary and useless to warn of the danger, no negligence can be predicated on failure to so warn. Forquer v. Slater Brick Co., 1908, 37 Mont. 426, 97 P. 843. Actionable negligence arises only from a breach of a legal duty or obligation. Ahlquist v. Mulvaney Realty Co., 1944, 116 Mont. 6, 152 P.2d 137; Mitchell v. Thomas, 1932, 91 Mont. 370, 8 P.2d 639; Cassady v. City of Billings, supra.

██ Before proceeding to a discussion of cases from other jurisdictions which have considered similar facts, it seems appropriate to refer to the Montana rules on assumption of risk and contributory negligence. The defense of assumption of risk "extends to relationships independent of the master-servant relationship". Cassady v. City of Billings, supra, and cases there cited. While the defenses of contributory negligence and assumption of risk are distinguish-

McCulloch v. Horton, 1936, 102 Mont. 135, 56 P.2d 1344, 1346; Nichols v. Consolidated Dairies, 1952, 125 Mont. 460, 239 P.2d 740, 28 A.L.R.2d 1216. Cf. Gray v. Fox West Coast Service Corporation, 1933, 93 Mont. 397, 18 P.2d 797; Myles v. Helena Motors, 1942, 113 Mont. 92, 121 P.2d 549.

10. See Annotation, 1953, 31 A.L.R.2d 1379; 57 C.J.S. Master and Servant § 603, p. 375. The duty of the contractee of course depends somewhat on the extent of control retained by the contractee. This rule is well stated by Corpus Juris Secundum: "Where the contractee retains control of the premises on which the work is being done, it is his duty to use reasonable care to keep them in a reasonably safe condition and he will be liable for injuries to servants of the contractor resulting from a breach of this duty, * * * but, where the working place is furnished and maintained by the individual contractor, possession of the site having been delivered to him for the purposes of constructing a building, the owner owes the employees only the negative duty, imposed by law, of refraining from rendering the place unsafe by any act of his own, and not an affirmative duty to keep the premises safe for the workmen." 57 C.J.S. Master and Servant § 603, p. 376.

11. On cross-examination Zimmer testified in part:

"Q. You stated you worked on at least two occasions for farmers. What was the nature of your work on those times? A. Most of it was driving tractor and that sort of thing.
"Q. You were acquainted then with machinery having moving parts because of your farm experience and around other machinery? A. Yes.
"Q. And you were aware of the dangers of moving machinery, are you? A. Yes.
 * * * * *
"Q. How long had it been before this actual incident took place that you had been standing there within a foot or so of that pulley? A. I do not know.
"Q. Do you recall while you were standing there that it had been running? A. Do I recall?
"Q. You recall it, don't you, of it running right there next to you? A. Yes.
"Q. Did it make much of a noise? A. The engine would make some noise, yes.
"Q. Were you aware just prior to this accident that if you happened to get your arm or some part of your body tangled up in that V-belt while the motor was running it would probably result in injury? A. Do you mean if I knew—explain that question please.
(The question was read)
A. If I got my arm caught in there, yes, I thought it would possibly do injury."

able, they are closely related, and under the facts here present may properly be considered together.

 "Every person is bound to an absolute duty to exercise his intelligence to discover and avoid dangers that may threaten him. When, therefore, a plaintiff asserts the right of recovery on the ground of culpable negligence of the defendant, he is bound to show that he exercised his intelligence to discover and avoid the danger, which he alleges was brought about by the negligence of the defendant." George v. Northern Pacific Ry. Co., 1921, 59 Mont. 162, 196 P. 869, 871.[12] Mere knowledge of the existence of an offending instrumentality, however, is not sufficient in itself to constitute contributory negligence; but "in addition the person so using it must have appreciated or must have had the opportunity to appreciate danger from its use before contributory negligence will bar recovery * * *". Lake v. Emigh, 1946, 118 Mont. 325, 167 P.2d 575, 578.[13]

It is stated in an A.L.R. annotation that "in an action brought by a contractor's servant against the contractee, it is a valid defense that the conditions by which the injury in question was occasioned were known to and appreciated by the plaintiff, and that he is consequently chargeable with an implied assumption of the risks arising from those conditions. This assumption is predicated independently of contract, and in this respect it differs from that which is regarded as constituting a bar to recovery in action brought by a servant against his own master." 44 A.L.R. 932, 1122.[14]

The Court of Appeals of the Ninth Circuit considered the questions here involved in Sullivan v. Shell Oil Company, 1956, 234 F.2d 733, certiorari denied 352 U.S. 925, 77 S.Ct. 221, 1 L.Ed.2d 160,— an action against the owner-occupier of premises by an employee of an independent contractor engaged in dismantling an oil tank. The court reversed a directed verdict in favor of the defendant, holding that the case presented issues of fact for the jury. In applying California law, the court said in part: "Employees of an independent contractor injured in the performance of a contract between their employer and the owner, are on the premises by the owner's invitation express or implied, and the owner owes a duty to warn against hidden dangers of which he knows or reasonably ought to know and of which they are unaware (citing cases); and the owner-occupier owes to them the duty to furnish them a safe place in which to work. More accurately stated, the owner-occupier must 'use reasonable care to keep his premises in a reasonably safe condition, and give warning of latent or concealed perils', (citing cases).

"But the owner-occupier is not liable when the injuries result from a danger obvious to the injured party. The obvious danger rule has been stated by the Supreme Court of California as follows: ' * * * If there is a danger attending upon such entry, or upon the work which the person invited is to do thereon, and

12. See also Sullivan v. Northern Pac. Ry. Co., 1939, 109 Mont. 93, 94 P.2d 651, 656; Hughey v. Fergus County, 1934, 98 Mont. 98, 37 P.2d 1035.

13. See also McCulloch v. Horton, 1936, 102 Mont. 135, 56 P.2d 1344; Neilson v. Missoula Creamery Co., 1921, 59 Mont. 270, 196 P. 357.

14. The annotation continues: "By most of the American courts which have had occasion to express their views upon the subject, the remedial rights of a contractor's servant have uniformly been determined upon the theory that his assumption of a risk becomes a conclusion in point of law, whenever it appears that the injured person was chargeable with knowledge, actual or constructive, of that risk." 44 A.L.R. 932, 1124.

"As in cases where a servant is suing his own master, contributory negligence precluding a servant of a contractor from maintaining an action against the contractee may be inferred from the fact that he entered upon or continued the performance of the work in question, with a knowledge of the conditions from which his injury resulted." 44 A.L.R. 932, 1129.

such danger arises from causes or conditions not readily apparent to the eye, it is the duty of the owner to give such person reasonable notice or warning of such danger.' (citing cases) 'But such owner is entitled to assume that such invitee will perceive that which would be obvious to him upon the ordinary use of his own senses. He is not required to give to the invitee notice or warning of an obvious danger." 234 F.2d at page 738.

With respect to the defenses of the assumption of risk and contributory negligence, the court said in part: "The rule on assumption of risk as compared to contributory negligence, was recently stated by the California Supreme Court and is pertinent here. 'The defenses of assumption of risk and contributory negligence are based on different theories. Contributory negligence arises from a lack of due care. The defense of assumption of risk, on the other hand, will negative liability regardless of the fact that plaintiff may have acted with due care. (See Prosser on Torts (1941), p. 377). It is available when there has been a voluntary acceptance of a risk and such acceptance, whether express or implied, has been made with knowledge and appreciation of the risk. (See Rest., Torts, § 893.) [15] Where the facts are such that the plaintiff must have had knowledge of the hazard, the situation is equivalent to actual knowledge, and there may be an assumption of the risk, but where it merely appears that he should or could have discovered the danger by the exercise of ordinary care, the defense is contributory negligence and not assumption of risk. * * *' (Citing cases.)

" ' " " 'The fact that one voluntarily assumes a certain degree of risk is not conclusive of negligence.' " ' DeGraf v. Anglo California Nat. Bank, 1939, 14 Cal. 2d 87, 100, 92 P.2d 899, 905. '* * * And before it can be said that one has "assumed the risk" of a specified hazard, it must be shown that he had knowledge of the condition creating the hazard', DeGraf v. Anglo California Nat. Bank, supra, 14 Cal.2d at page 100, 92 P.2d at page 905; Hayes v. Richfield Oil Corp., 1952, 38 Cal.2d 375, 385, 240 P.2d 580." [16]

In Stein v. Battenfeld Oil & Grease Co., 1931, 327 Mo. 804, 39 S.W.2d 345, the court affirmed a judgment of nonsuit where an independent contractor was killed while repairing electrical apparatus in defendant's manufacturing plant. Deceased became entangled in a belt running from an electric motor. The court stated: "The deceased, in going to the respondent's plant as an independent contractor to do work, was an invitee.

15. Restatement, Torts, § 893, states the following rule with respect to voluntary exposure to risk as a defense:
"A person who knows that another has created a danger or is doing a dangerous act or that the land or chattels of another are dangerous, and who nevertheless chooses to enter upon or to remain within or permit his things to remain within the area of risk is not entitled to recover for harm unintentionally caused to him or his things by the other's conduct or by the condition of the premises, except where the other's conduct constitutes a breach of duty to him or to a third person and has created a situation in which it is reasonably necessary to undergo a risk in order to protect a right or avert a harm."
The comment under this rule includes:
"The defense of assumption of risk normally exists also, even though the defendant has contracted not to maintain a dangerous condition and violates his contractual obligation by so doing. Thus, where a person employs a contractor to do work upon his building and has agreed to supply safeguards for the protection of the contractor, he is not liable in an action of tort for harm to the contractor resulting from the failure to provide such safeguards if, at the beginning of the work, the contractor discovers their lack and appreciates the risk but nevertheless continues." (Comment b)

16. While the Montana court has not set forth explicitly the distinction between assumption of risk and contributory negligence, it has recognized a distinction and, in my opinion, this statement from the California court is consistent with the Montana cases. See Cassady v. City of Billings, supra, and cases there cited.

The respondent would be liable for injury to him occasioned by any unsafe condition of the premises encountered in the work, which was known to it but unknown to him; but was not liable for injuries resulting from conditions obviously dangerous and known by the deceased to be so. As to these, he was guilty of contributory negligence, or, more accurately, assumed the risk." 39 S.W.2d at page 351.[17]

In McKee v. Patterson, 1954, 153 Tex. 517, 271 S.W.2d 391, an employee of a subcontractor was injured when he fell from a ladder which was resting on a polished floor. Plaintiff sought to recover from the general contractor on the ground that he was negligent in allowing the floor to be finished before the overhead carpentry. The court assumed, for the purposes of the opinion, that defendant was negligent in scheduling the work in that order, but held that as a matter of law that plaintiff voluntarily exposed himself to the dangers of working on the slick floor and that defendant breached no duty it owed to him. The court said:

"A general contractor in control of premises owes a duty to the employees of subcontractors similar to that owed by an owner or occupier of land to his invitees * * *.

"There are two legal theories, wholly aside from plaintiff's own negligence, for denying liability in a suit against an owner or occupier of land brought by an invitee for injuries growing out of open and obvious dangers thereon. One rests on the judicial concept that there is no breach of any duty the landowner owes to his invitees. The other arises out of the doctrine of violenti non fit injuria—voluntary encountering of risk—which is regarded as a defense to all negligent actions. In this state both theories are recognized. Actually, in their application to a given fact situation the two theories so completely overlap as to be almost indistinguishable." 271 S.W.2d at page 393.[18]

▮▮▮ It is true, as plaintiff contends, that this case does not involve defective

---

17. Plaintiff relies strongly upon an earlier Missouri case, Jewell v. Kansas City Bolt & Nut Co., 1910, 231 Mo. 176, 132 S.W. 703, 707. While certain language of the court's opinion lends support to plaintiff's position, the case factually is distinguishable. There was a question as to whether plaintiff's superior was a foreman for the defendant or an independent contractor. It was undisputed that defendant owned and operated the plant "and had exclusive control over every department thereof", including the engines, boilers, and machinery connected therewith. The court recognized "in passing" that if plaintiff's superior were an independent contractor, defendant would not be liable for any act "over which the company had no control". Here it is undisputed that L & L was an independent contractor and that plaintiff was an invitee of defendant. As hereinabove set forth, defendant did not have "exclusive control" of the machinery.

18. The court said further: "In determining whether a landowner is liable to an invitee for injuries sustained on the premises, the duty of the landowner is frequently phrased as one 'to exercise ordinary care to keep the premises in a reasonably safe condition' so that the invitee will not be injured * * * It is now well established in this state that the duty as there expressed does not extend to those invitees who know or should know of the existence of the particular condition and who appreciates or should appreciate its dangers. (citing cases). What the qualification means, of course, is that inasmuch as the invitee has knowledge of the dangers there is no duty on the owner to warn him of them. It means also that if, having knowledge of the dangers, the invitee exposes himself to them he must take the premises as he finds them and there is no duty on the owner to protect him even by the use of reasonable precaution to eliminate the hazards." 271 S.W. 2d at pages 393-394.

See also Ford Motor Company v. Tomlinson, 6 Cir., 1956, 229 F.2d 873, certiorari denied, 352 U.S. 826, 77 S.Ct. 38, 1 L.Ed.2d 49; Creasy v. Ohio Power Company, 6 Cir., 1957, 248 F.2d 745, 748; Coggins v. Hanchette, Cal.App.1959, 331 P.2d 751; Scheiber v. Grigsby, 1947, 28 Wash.2d 322, 182 P.2d 745.

machinery, but the same principles of law are applicable with respect to unguarded moving machinery. The question in each case is whether the danger is open and obvious, and whether the invitee appreciated the danger or, as a reasonably prudent person, should have done so.[19] Naturally, the question of whether the danger is obvious or latent arises more frequently in cases involving defective machinery.

It is my conclusion that the independent contractor was in control of the premises where the accident occurred, subject to joint control with defendant with respect to turning the pump engine on and off. Defendant's foreman and pump gauger and the independent contractor's foreman all had authority to shut off and restart the engine and, in fact, had done so. As far as shown by the evidence, the only person who did so the day of the accident was the foreman of the independent contractor. It is conceded that plaintiff was an employee of the independent contractor and an invitee of the defendant.

There were no "hidden or lurking dangers". The unguarded V-belt was open and obvious. The existence of the dangerous condition was known to plaintiff, who appreciated or should have appreciated its danger.

It is accordingly my opinion that (1) the evidence failed to establish a breach of any duty owed by the defendant to plaintiff; and (2) the plaintiff assumed the risk of the injury which he sustained.

Pursuant to Rule 11 of the local rules of court, the defendant shall, within ten days, prepare, serve and file proposed findings of fact and conclusions of law and draft of judgment in accordance with this opinion.

19. This rule is recognized in many cases where judgments for plaintiffs have been affirmed or judgments on directed verdicts have been reversed on the ground that a jury issue was presented. See, for example, Austin v. Riverside Portland Cement Co., 1955, 44 Cal.2d 225, 282 P.2d 69; Carr v. Wallace Laundry Co., 1918, 31 Idaho 266, 170 P. 107. It is also the basis for distinguishing many of the cases cited by plaintiff, including Kentucky Stone Co. v. Bryan's Adm'r, Ky. 1905, 84 S.W. 537; McGrath v. Pennsylvania Sugar Co., 1925, 282 Pa. 265, 127 A. 780.