James P. SULLIVAN, Appellant,

v.

SHELL OIL COMPANY, Appellee.

Herman R. ENGBERSON, Appellant,

v.

SHELL OIL COMPANY, Appellee.

Nos. 14570, 14571.

United States Court of Appeals
Ninth Circuit.

June 20, 1956.

Rehearing Denied July 31, 1956.

J. Adrian Palmquist, Oakland, Cal., Frank T. Cornish, Berkeley, Cal., for appellant.

Weinman, Rode, Burnhill & Moffitt, Oakland, Cal., Cyril Viadro, San Francisco, Cal., for appellee.

Before HEALY and BONE, Circuit Judges, and JAMES M. CARTER, District Judge.

JAMES M. CARTER, District Judge.

This appeal raises the question of the duty of an owner-occupier of premises to the employees of an independent contractor engaged in dismantling a tank on the premises. The action is one to recover damages for personal injuries sustained when the center column of one of defendant's storage tanks on which plaintiffs were working, collapsed.

The question is here on appeal by plaintiffs, Sullivan and Engberson, from a directed verdict and judgment in favor of defendant, Shell. Jurisdiction of the District Court was based on diversity of citizenship.

Upon appeal from a judgment of dismissal entered upon the close of all the evidence, the appellant is entitled to the benefit of every inference which can reasonably be drawn from the evidence viewed in the light most favorable to the cause of action asserted. Gunning v. Cooley, 1930, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720; Schnee v. Southern Pacific Co., 9 Cir., 1951, 186 F.2d 745, 746; Graham v. Atchison, T. & S. F. Ry. Co., 9 Cir., 1949, 176 F.2d 819, 823; Kingston v. McGrath, 9 Cir., 1956, 232 F.2d 495.

Viewing the evidence in such light, the record discloses the following: Plaintiffs were employees of Southwest Welding & Manufacturing Company, hereafter referred to as Southwest. Southwest, in 1952, contracted with the defendant, Shell, to dismantle and rebuild a number of storage tanks including Tank 1006, a steel tank 24 feet high and 24 feet in diameter.

The center column, the main support for the roof, consisted of six inch channel backed by four inch channel. The column was anchored at the bottom of the tank, and welded at the top to a circular piece of metal, 24 inches in diameter, called the "dollar plate." Twelve rafters were bolted to the dollar plate at one end, and, spreading out like the spokes of a wheel, were welded to clips on the inside of the shell of the tank at the other end. The steel roof was welded to the sides or shell of the tank. The roof thus was supported by the center column, the rafters and the sides of the tank.

Tank 1006 was put in service by Shell in May of 1951 and used for the storage of hydro-carbons and sulphuric acid. In January 1952 the tank was inspected by Shell. The inspection, conducted by Shell employees, was made in order to establish the corrosive rate of the metal, thereby enabling Shell to determine the approximate retirement date of the tank.

Following the inspection, it was concluded that the tank should be taken out of service in August of 1952. A further inspection in August of 1952 by Shell, revealed that the metal was extremely corroded and in places the center column was corroded through, leaving holes the size of baseballs or golf balls. The tank was then withdrawn from service and bids let for dismantling and rebuilding.

The customary procedure in dismantling such a tank is as follows: The roof of the tank is cut in half with acetylene torches; then the workers burn around the shell of the tank where the roof joins the shell; next the halves are themselves cut in half and lift pads are welded onto each quarter and removed by crane. At the start of the operation a hole is burnt in the center of the roof to allow fumes to escape. This exposes the dollar plate with the rafters resting on top of the dollar plate and bolted thereto.

While there is still some roof there to work on, the heads of the bolts that hold the inside edge of the rafter to the dollar plate are burnt off. The bolt itself does not drop through. Pressure keeps the bolt in place, holding the rafter to the dollar plate. Following the complete removal of the roof the rafters are removed one by one by burning the clip off at the outside edge of the rafter, and the rafter is then hit up or down, or jiggled to drop the bolts, and then removed.

Following this, the center column is taken out by wrapping a sling around it. Lastly, the outside shell itself is removed by burning off portions of the plate, piece by piece. With everything moving smoothly, a tank such as that Tank 1006 could be dismantled in one day.

On the particular day in question, the following work had been done. The hole was cut in the center of the roof, half of the roof had already been removed and the other half had been burnt almost all the way around the outside edge. The heads of the bolts that connected the rafters to the center column had been burnt off. Sullivan was starting to burn the remaining half into quarters when Engberson came up on top of the roof. It was at this time that the center column collapsed, resulting in the injuries to the appellants.

As to appellants' knowledge, if any, of the defective column, the record shows: Both appellants were experienced in the field of repairing, dismantling and constructing tanks, Sullivan having performed this work for eleven years and Engberson for twelve or thirteen.

Sullivan testified that prior to the accident no one from Shell had talked to him about the tank; that he knew nothing of its prior condition, or what its contents had been; that he had no knowledge of the condition of the center column and that although he knew the center column was to be scrapped, and the top, bottom, and rafters saved for rebuilding, this meant nothing to him insofar as the condition of the center column as a support member was concerned; that there were two open manholes at the bottom of the tank, but he did not look inside, nor make any examination of the center column; that it was not his job to inspect the center column; that he had not investigated because "we start work on a tank, the tank is supposed to be O.K. to go on, reasonably safe to go on, and furthermore, we aren't inspectors, we aren't qualified as inspectors to go in and inspect the tank. It is supposed to be done by men that are qualified and if it is safe or not safe to tell us about it."

Engberson testified that he was never at the tank with anybody from Shell to make an inspection of the tank; that he talked with Mr. Slobodnick of Shell as to what fittings he wanted saved; that Cady of Southwest gave him the work order the day before the accident; that he knew that the top, bottom and rafters of the tank were to be reused in rebuilding the tank; that he had been inside the tank for about ten minutes with Cady on a date two or three days before the accident happened and that from what he could see everything looked all right; that it was fairly dark inside the tank and one could not see very well;

one could not see the top six or eight feet of the center column; that Cady asked him how much of the column he wanted to save; that he replied that as long as part was going to be scrapped, they might as well scrap all of it; that no one at Southwest told him anything about the center column and that he never saw any of Shell's inspection reports; that he only had the work order in his possession; that he had heard this was an acid tank; that instructions to scrap a center column did not mean to him that the center column was no good insofar as support was concerned.

Beck, Plant Superintendent of Southwest had looked in the manhole before the accident and when asked if he saw anything unusual, answered, "Nothing except it was dark." Steele, another worker on the job testified he could not tell before the accident, even with half the roof cut off, that the center column was in bad shape; that the tank looked good all over to him; that after the accident, inspection of the center column showed it was thin, about an eighth of an inch in thickness; that when the column buckled, "she just spread out like a gopher snake."

There was evidence from Shell inspectors and engineers that even a trained man could not tell whether metal is good or not with the naked eye; that special instruments and techniques are required for inspections, a C-clamp, a micrometer, and audigage and a ballpeen hammer. Trent, a Shell inspector, testified one could not see or visualize a thinning of the metal, that it would take a clamp; that one could see the edges have thinned from the original thickness, but one could not visualize how thick or how thin they were; that he could not determine by merely looking at the metal whether it was sound or unsound, that was why he carried instruments.

The trial court reserved ruling on the motion for a directed verdict at the close of appellants' case. Rule 50, Fed.Rules Civ.Proc. 28 U.S.C.A. At the close of the evidence on both sides he granted the motion. In so doing and in entering judgment for Shell, the trial court held that Shell owed no duty to the plaintiffs insofar as their injuries were caused by conditions which the contractor was employed to remedy.

It is appellants' contention that the court erred in directing a verdict for Shell and entering judgment thereon; that Shell owed to them the duty to maintain its premises in safe condition, i. e. to furnish them a safe place in which to work; that such duty was not fulfilled and as a result thereof they sustained the injuries of which they now complain.

■ There can be no argument that the jury would have been entitled to find that the *center column was in fact defective*, since the accident itself is evidence thereof. Paxton v. County of Alameda, 1953, 119 Cal.App.2d 393, 408, 259 P.2d 934. There was ample testimony in the record as well for the jury to arrive at this conclusion.

■ Clearly, the jury could have found that Shell had *knowledge* of the defective column. Webb, a Shell engineer, gave his opinion that the central column of the tank was corroded beyond the point where it could be considered a safe structural member.

■ There is a dispute as to whether Southwest had such knowledge, but the jury might find they did not. Even if Southwest had such knowledge, that knowledge would not be *imputed* to Southwest's employees Sullivan and Engberson. In a case extensively cited by the California Supreme Court on other points, the court said, " * * * the contractor's knowledge or notice to him of the danger is not imputable to his employees, who are invitees", Dobbie v. Pacific Gas & Electric Co., 1928, 95 Cal. App. 781, 790, 273 P. 630, 634. Raich v. Aldon Construction Co., 1954, 129 Cal. App.2d 278, 276 P.2d 822 is impliedly authority for the same proposition. Miller the contractor, employing Raich the injured party, had knowledge of a hidden gasoline line. 129 Cal.App.2d at page 281, 276 P.2d at page 825. This knowledge was not imputed to Raich and recov-

ery was permitted against the general contractor.

Thus from the record the jury could have found that the defect was latent, not obvious, and was known to Shell, but that the appellants did not know of the defect. From these facts they could have found negligence on the part of Shell in failing to warn these invitees of the hidden danger.

The trial court took the case from the jury, not on the basis that such findings might not have been made but on the basis of Nagle v. City of Long Beach, 1952, 113 Cal.App.2d 669, 248 P.2d 799, considered hereafter, and held that the question was one of law. The trial court termed the legal question involved "a close one."

■ In a diversity action, as here, the district court sits as "another court of the State," Guaranty Trust Co. of N. Y. v. York, 1945, 326 U.S. 99, 108, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079. This case is controlled by principles of California law.

■ The general rule in California is, that as to business guests or invitees, the owner-occupier is "obliged to exercise ordinary care to keep the premises in a reasonably safe condition, or to warn * * * of danger." The duty is "not limited to conditions actually known * * * to be dangerous," but extends also "to conditions which might have been found dangerous by the exercise of reasonable care", Blumberg v. M. & T. Incorporated, 1949, 34 Cal.2d 226, 229, 209 P.2d 1, 3; Raber v. Tumin, 1951, 36 Cal. 2d 654, 658, 226 P.2d 574; Bazzoli v. Nance's Sanitarium, Inc., 1952, 109 Cal. App.2d 232, 236, 240 P.2d 672.

■■ Employees of an independent contractor injured in the performance of a contract between their employer and the owner, are on the premises by the owner's invitation express or implied, and the owner owes a duty to warn against hidden dangers of which he knows or reasonably ought to know and of which they are unaware, Dobbie v. Pacific Gas & Electric Co., supra; Buckingham v. San Joaquin Cotton Oil Co., 1932, 128 Cal.App. 94, 16 P.2d 807; and the owner-occupier owes to them the duty to furnish them a safe place in which to work. More accurately stated, the owner-occupier must "use reasonable care to keep his premises in a reasonably safe condition, and give warning of latent or concealed perils", Pauly v. King, 1955, 44 Cal.2d 649, 653, 284 P.2d 487, 489; Crane v. Smith, 1943, 23 Cal.2d 288, 296, 144 P.2d 356; Austin v. Riverside Portland Cement Co., 1955, 44 Cal. 2d 225, 233, 282 P.2d 69.[1]

■ But the owner-occupier is not liable when the injuries result from a danger obvious to the injured party. The *obvious danger* rule has been stated by the Supreme Court of California as follows:

"* * * If there is a danger attending upon such entry, or upon the work which the person invited is to do thereon, and such danger arises from causes or conditions not readily apparent to the eye, it is the duty of the owner to give such person reasonable notice or warning of such danger." Shanley v. American Olive Co., 1921, 185 Cal. 552, 555, 197 P. 793, 794; Hinds v. Wheadon, 1942, 19 Cal.2d 458, 460, 121 P.2d 724, reversing a judgment for a nonsuit; Brown v. Board of Trustees, 1919, 41 Cal.App. 100, 107, 182 P. 316. "But such owner is entitled to assume that such invitee will perceive

1. Two subsequent cases in the Supreme Court, referred to in appellee's supplemental brief, are not *in conflict with this* rule. In McDonald v. Shell Oil Co., 1955, 44 Cal.2d 785, 285 P.2d 902, judgment for non-suit as to the owner was affirmed, where the injury to the employee resulted from defective equipment, supplied and operated by the contractor-employer. In

Snyder v. Southern California Edison Co., 1955, 44 Cal.2d 793, 285 P.2d 912, judgment for defendant was reversed for failure to properly instruct the jury as to the defendant's duty as a public utility under statute and rules, to properly set a pole. Reference to the owner's common law duty is made at page 803 of 44 Cal.2d, at page 917 of 285 P.2d.

that which would be obvious to him upon the ordinary use of his own senses. He is not required to give to the invitee notice or warning of an obvious danger. 29 Cyc. 471, 474; 26 Cyc. 1213. * * *" Shanley v. American Olive Co., supra, 185 Cal. at page 555, 197 P. at page 794.

The Shanley case has been repeatedly cited by the California Supreme Court.

■ As to the duty of the employee on premises to discover dangers, the courts have said:

" ' * * * "The employe is not required to use any degree of care or diligence to discover defects. He will be held to have assumed the risk only when he knew, and will be held to have known when the defect was so obvious that he must have known, or simply refused to open his eyes and see, or when he was put upon inquiry by some discovery or suggestion of danger which it was gross carelessness for him to neglect." ' This principle is as applicable to an invitee, as was plaintiff, as to that of an employee", Emery v. Pacific Telephone & Telegraph Co., 1941, 43 Cal.App.2d 402, at pages 409–410, 110 P.2d 1079, 1084. Accord: Moran v. Zenith Oil Co., 1949, 92 Cal.App.2d 236, 243, 206 P.2d 679; Billeter v. Rhodes & Jamison, Ltd., 1951, 104 Cal.App.2d 137, 144, 231 P.2d 93.

■ The rule on assumption of risk as compared to contributory negligence, was recently stated by the California Supreme Court and is pertinent here. "The defenses of assumption of risk and contributory negligence are based on different theories. Contributory negligence arises from a lack of due care. The defense of assumption of risk, on the other hand, will negative liability regardless of the fact that plaintiff may have acted with due care. (See Prosser on Torts [1941], p. 377.) It is available when there has been a voluntary acceptance of a risk and such ac-

ceptance, whether express or implied, has been made with knowledge and appreciation of the risk. (See Rest., Torts, § 893.) Where the facts are such that the plaintiff must have had knowledge of the hazard, the situation is equivalent to actual knowledge, and there may be an assumption of the risk, but where it merely appears that he should or could have discovered the danger by the exercise of ordinary care, the defense is contributory negligence and not assumption of risk. Hayes v. Richfield Oil Corp., 38 Cal.2d 375, 385, 240 P.2d 580; See Prosser on Torts [1941], p. 386", Prescott v. Ralph's Grocery Co., 1954, 42 Cal.2d 158, 161–162, 265 P.2d 904, 906; Austin v. Riverside Portland Cement Co., 1955, 44 Cal.2d 225, at page 235, 282 P.2d 69.

■ " ' "The fact that one voluntarily assumes a certain degree of risk is not conclusive of negligence." ' " DeGraf v. Anglo California Nat. Bank, 1939, 14 Cal.2d 87, 100, 92 P.2d 899, 905. " * * And before it can be said that one has 'assumed the risk' of a specified hazard, it must be shown that he had knowledge of the condition creating the hazard", DeGraf v. Anglo California Nat. Bank, supra, 14 Cal.2d at page 100, 92 P.2d at page 905; Hayes v. Richfield Oil Corp., 1952, 38 Cal.2d 375, 385, 240 P.2d 580.

■ It is hornbook law that, ordinarily, questions of negligence, contributory negligence and assumption of risk are questions of fact for the jury, Callahan v. Gray, 1955, 44 Cal.2d 107, 111, 279 P.2d 963. It is only where "no other reasonable conclusion is legally deductible from the evidence," Raber v. Tumin, 1951, 36 Cal.2d 654, 656, 226 P.2d 574, 575, that the question becomes one of law, authorizing the trial court to grant a nonsuit (under California procedure) or a motion for directed verdict (federal procedure).

■ "The question of knowledge and appreciation of a danger or the lack thereof * * * is ordinarily one to be determined by the jury from the facts of the case", DeGraf v. Anglo California Nat. Bank, supra, 14 Cal.2d at page 100,

92 P.2d. at page 906. " ' " * * * negligence is a question of fact for the jury, even when there is no conflict in the evidence, if different conclusions upon the subject can be rationally drawn from the evidence" ' ", McBride v. Atchison, Topeka & S. F. Ry. Co., 1955, 44 Cal. 2d 113, 119, 279 P.2d 966, 967. "A defendant's conduct must always be gauged in relation to all the other material circumstances surrounding it, and if such other circumstances admit of a reasonable doubt as to whether such questioned conduct falls within or without the bounds of ordinary care then such doubt must be resolved as a matter of fact rather than of law", Seneris v. Haas, 1955, 45 Cal.2d 811, 823, 291 P.2d 915, 922.

The intermediate tribunals of California have purported to say that in a certain class of owner-occupier cases, involving construction of buildings, the question of negligence, contributory negligence and assumption of risk become, ipso facto, a question of law. They would thus make an exception to the general rule of owner-occupier liability. These cases state:

"The rule is established in California that an invitee to an incompleted building in process of construction is invited to use such building in its then condition", Kolburn v. P. J. Walker Co., 1940, 38 Cal. App.2d 545, 549, 101 P.2d 747, 749; Mitchell v. A. J. Bayer Co., 1954, 126 Cal.App.2d 501, 272 P.2d 870; Irvine v. J. F. Shea Co., 1940, 41 Cal. App.2d 458, 107 P.2d 80, citing Kolburn, supra, and hold that the question is one of law. These cases affirmed judgments of nonsuit or judgments on the pleadings.[2]

But Austin v. Riverside Portland Cement Co., 1955, 44 Cal.2d 225, 282 P.2d 69, and Pauly v. King, 1955, 44 Cal.2d 649, 284 P.2d 487, both involved construction projects and in neither of them are the above cases or the claimed exception to the general rule, cited by the Supreme Court of California. Nor have the above appellate cases been cited elsewhere with approval by the Supreme Court of California for such exception.

Nagle v. City of Long Beach, supra, relied on by the trial court, presents a possible further exception by an intermediate state tribunal. There an employee of a contractor engaged in repairing a gas tank was injured when a ladder gave way. Nagle was on city property "as part of a labor group specifically brought there for the purpose of strengthening and refurbishing a wooden structure within the gas reservoir. He was * * * employed to assist in remedying the grossly defective conditions which contributed to his injuries. The very nature of his employment was itself warning of the dangers to be encountered", 113 Cal.App.2d at page 672, 248 P.2d at page 800. An alternate ground of holding was that there was no proof of the nature of the defective condition of the ladder. "Where such proof is lacking, there can be no finding that a reasonable inspection by respondent [owner] would have discovered the alleged danger", 113 Cal.App.2d at page 672, 248 P.2d at page 801. Judgment of nonsuit was affirmed.[3]

Other California cases from the intermediate tribunals do not hold that an invitee repairing part of a structure, cannot under any circumstances, recover for injuries caused by any defect. Instead, the fact an invitee was present for the

2. The leading intermediate appellate case underlying, and relied on by these authorities, detracts from their force, Ambrose v. Allen, 1931, 113 Cal.App. 107, 298 P. 169, does not hold that the question is one of law. It affirmed a judgment based on a jury verdict where proper instructions had been given. It stated, "This court may not hold as a matter of law that the facts contained in this record do not support the verdict of the jury * * *." 113 Cal.App. at page 112, 298 P. at page 171.

3. It can be argued that the second ground is the holding of the case since there were no facts showing notice to the owner-occupier. In such event the first ground stated would be only dictum.

making of repairs did not bar him recovering in Bazzoli v. Nance's Sanitarium, Inc., supra, where the defect was one which the invitee would not expect to encounter in his work. In Dobbie v. Pacific Gas & Electric Co., supra, an invitee who was on the premises to make repairs had recovery for injuries received as a result of a defective skylight on the roof which had been permitted to become obscured by soot. This was not the type of defect which one present to repair some other part of the building would expect to encounter. Emery v. Pacific Telephone & Telegraph Co., 1941, 43 Cal.App.2d 402, 110 P.2d 1079, allowed recovery to an invitee who was on a pole reattaching some power lines, the insulators of which had been repaired, for injuries which he received when he was thrown to the ground by a rotted pole base which reasonable care and inspection by the owner would have disclosed. Hinds v. Wheadon, supra, reversed a judgment for nonsuit where a welder was repairing tanks by welding brackets on the outside and received injuries when the heat of the welding exploded gas on the inside which would not have been there if the owner had kept the tank full of water.

Shell would have this court go a step further, and, based on Nagle v. City of Long Beach, supra, hold that California law provides that employees of an independent contractor such as Sullivan and Engberson, sent upon the premises to *dismantle* a tank, were *as a matter of law* not entitled to recover for injuries resulting from the defective center column.

We see from the foregoing that the obvious defect which a plaintiff saw or knew of, is contrasted with the latent or unobvious defect, which the plaintiff did not know of and was not required to discover.

This takes us well along the way to a solution of our problem. Where, for example, an employee of an independent contractor enters premises with express directions to repair defective wiring and in so doing sustains injuries from electric shock, it might be argued that he was not as a matter of law entitled to go to the jury, since he clearly knew of the existence of the defect, even if the defect was not "visible" or "obvious." Nagle v. City of Long Beach, supra, comes closest to this situation, although as indicated above the case rests on a dual holding. There the injured party was sent in to repair certain woodwork which had been for years under water. He was injured on a part thereof, a wooden ladder. But no California case holds that where the injured party is sent to repair or dismantle, he can under no circumstances, as a matter of law, recover for injury from a latent defect known to the owner-occupier.

When the injured party is sent on to the premises to do certain work, such as generally dismantle, it does not follow as a matter of law, that he knows, or that there will be obvious to him or that he will discover every defect. No California case goes that far.

The California Supreme Court cases of Blumberg v. M. & T., Inc., supra, Raber v. Tumin, supra and Hinds v. Wheadon, supra, in each of which a judgment of nonsuit was reversed, are persuasive as to the view of the Supreme Court that these owner-occupier cases generally present questions of fact. Particularly so is Blumberg, supra, where Mrs. Blumberg's high heel caught in an opening in a mat on which she was walking, resulting in a fall. The court stated, "Moreover, whether the nature of the mat was obvious to Mrs. Blumberg was a question of fact for the determination of the jury", 34 Cal.2d at page 230, 209 P.2d at page 3.

 This court in a diversity case is required to determine California law on our precise question. The Supreme Court of the United States, in King v. Order of United Commercial Travelers, etc., 1948, 333 U.S. 153, 158, 68 S.Ct. 488, 491, 92 L.Ed. 608, summarized the prior holdings of that court as follows: "federal courts are bound by decisions of a state's intermediate appellate courts unless there is persuasive evidence that

the highest state court would rule otherwise. Six Companies of California v. Joint Highway District, 1940, 311 U.S. 180, 61 S.Ct. 186, 85 L.Ed. 114; West v. American Tel. & Tel. Co., 1940, 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139; and Stoner v. New York Life Ins. Co., 1940, 311 U.S. 464, 61 S.Ct. 336, 85 L.Ed. 284."[4]

We think there is persuasive evidence the California Supreme Court will not adopt the rule of the Nagle case. We do not find the "construction project" cases or the Nagle case even cited by the California Supreme Court. That court has held that only if the defect was obvious or one which the injured party "must" have known of, is there assumption of risk as a matter of law; only if the injured party "should or could have discovered the danger by the exercise of ordinary care," Prescott v. Ralph's Grocery Co., supra [42 Cal.2d 158, 265 P.2d 906]; Austin v. Riverside Portland Cement Co., supra, when considered with the duty of the owner to provide a safe premises free from latent defects, and considered with the invitee's lack of duty to inspect for latent dangers, is there contributory negligence as a matter of law.

The effect of the District Court's order in granting the motion for directed verdict was to hold, as a matter of law, that appellants either *knew* of the defective center column or *must have known* of it; or to hold, that notwithstanding the fact that appellants were invitees, and under no duty to search for hidden dangers,

that they should or could have discovered the hidden danger by the exercise of ordinary care.

 Under the facts of this case, we think that these were questions of fact to go to the jury.[5]

The judgment is reversed and remanded.

---

4. On the question of ascertaining State law, see also: 35 C.J.S., Federal Courts, § 174, p. 1256; Seymour v. Union News Co., 7 Cir., 1954, 217 F.2d 168, 169; Cooper v. American Airlines, Inc., 2 Cir., 1945, 149 F.2d 355, 357–358, 162 A.L.R. 318; American Surety Co. of New York v. Bank of California, D.C.Or.1941, 44 F. Supp. 81, 83, affirmed 9 Cir., 1943, 133 F.2d 160; Princess Garment Co. v. Fireman's Fund Ins. Co., 6 Cir., 1940, 115 F.2d 380, 383; McCoy v. Providence Journal Co., 1 Cir., 1951, 190 F.2d 760, 765.

National Foam System, Inc., v. Urquhart, 3 Cir., 1953, 202 F.2d 659, 661; International Brotherhood of Teamsters, etc., Union v. Hanke, 1950, 339 U.S. 470, 70 S.Ct. 773, 94 L.Ed. 995; State of California, Department of Employment v. Fred S. Renauld & Co., 9 Cir., 1950, 179 F.2d 605, 609; Lembcke v. United States, 2 Cir., 1950, 181 F.2d 703, 707.

5. We have not considered cases from other jurisdictions. An annotation on the "Duty of owner of premises to furnish independent contractor or his employees a safe place to work, where contract is for repairs," appears in 31 A.L.R.2d 1375.